STATE DIVISION OF HUMAN RIGHTS, on Complaint of CATHERINE McDERMOTT, Petitioner, v XEROX CORPORATION, Respondent.

Fourth Department, July 13, 1984

### APPEARANCES OF COUNSEL

*Catherine R. McDermott,* petitioner *pro se.*

*Harris, Beach, Wilcox, Rubin & Levey (Richard Chapman* of counsel), for Xerox Corporation, respondent.

*Robert Abrams, Attorney-General (Peter Clary* of counsel), for State Division of Human Rights Appeal Board, respondent.

### OPINION OF THE COURT

HANCOCK, JR., J.

Catherine McDermott, the complainant, was refused a job by respondent Xerox solely because of a medical condition described by Xerox' Director of Health Services as "active gross obesity". Following a hearing on her complaint of discrimination under the Human Rights Law (Executive Law, art 15), the Commissioner found that Xerox had violated Executive Law (§ 296, subd 1, par [a])

in unlawfully refusing to hire her because of a disability as defined in subdivision 21 of section 292 of the Executive Law. The Human Rights Appeal Board reversed and McDermott in her petition pursuant to section 298 of the Executive Law seeks a reversal of the Board's order. For reasons which follow, we grant her petition and reinstate the Commissioner's determination.

The facts are essentially undisputed. On August 8, 1974, Xerox made McDermott a written offer of a position as a senior business systems consultant contingent upon her passing the preemployment medical examination. She accepted the offer and on August 26, 1974 underwent the examination. In his report submitted to Xerox, the examining physician noted that complainant was 5 feet 6 inches tall and weighed 249 pounds. In the space headed, "Describe every abnormality in detail", he wrote "Obese"; he noted no other physical abnormalities or diseases. Based on the results of the medical examination, Dr. C. Craig Wright, then Director of Health Services for Xerox, recommended that McDermott not be hired. Upon receipt of this recommendation from Dr. Wright, David C. Melroy, an executive in Xerox' information systems group who had interviewed McDermott, urged Dr. Wright to reconsider. In an in-house memorandum, Dr. Wright described his conversation with Melroy as follows: "Manager Dave Melroy came in this morning. He insists that he has worked with this applicant and that she performed satisfactorily. *I explained in detail to him the significance of gross obesity and its relationship to emotional disease. I also covered the serious risk to the Short Term Disability, Long Term Disability and life insurance programs.* I advised him that he could inform the applicant that she could be reconsidered at a new weight of 170#, which would still constitute 25% obesity" (emphasis added). Xerox informed McDermott by letter dated September 3, 1974 that she had not passed the preemployment medical examination and that the employment offer had been withdrawn. Xerox did not then nor does it now dispute that she was fully qualified for the position and that her abnormal obesity was completely "unrelated to [her] ability to engage in the activities involved in the job" (Executive Law, § 292, subd 21, prior to amdt by L 1979, ch 594) which had been offered to her.

At the hearing held by the division in 1981,[1] McDermott testified to the contents of a telephone conversation with Dr. Wright, in September, 1974, in which he told her that she had a "disease" for which she needed immediate treatment, viz., "active gross obesity". She said that despite her excess weight, which she accepts and which for years has been stable, she does not consider herself impaired or in any way inhibited in her work or in "managing" the usual "affairs of life" except in carrying bundles for long distances. Apart from her chronic condition of obesity, for which she had in the past been treated with thyroid medication, it appears that McDermott's health had been consistently good.

Dr. Wright testified that he had instructed the examining physicians to use height and weight tables published in 1966 by Metropolitan Life Insurance Company to ascertain acceptable weight ranges for Xerox' employment candidates. McDermott's weight exceeded by over 100 pounds the recommended weight for women of her height. According to Dr. Wright, obesity would ordinarily not affect a person's job performance in the short term, but "over the long term the obese group will have a higher absenteeism rate, higher utilization rate of long-term and disability benefits, medical care plans, life insurance". Obesity, he explained, may be involuntary, i.e., resulting, for example, from a glandular condition, or voluntary, i.e., the result of overeating. Since he had not examined McDermott, he could not say what caused her obesity.

At the time of Xerox' refusal to hire McDermott, the newly enacted definition of disability read in pertinent part: "The term 'disability' means a physical, mental or medical impairment resulting from anatomical, physiological or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques" (Executive Law, § 292, subd 20, added by L 1974, ch 988,

---

1. The State Division of Human Rights originally dismissed the complaint on the ground that the act of discrimination occurred prior to September 1, 1974, the effective date of the amendment of the Human Rights Law to include disability. We vacated the Appeal Board's order of affirmance and reinstated the complaint, holding that the discriminatory act occurred on September 3, 1974, the date of the letter revoking the employment offer (see *State Div. of Human Rights v Xerox Corp.*, 73 AD2d 806).

renum subd 21, L 1976, ch 632). In his written decision concluding that Xerox had refused to hire McDermott because of a "disability" in violation of section 296 (subd 1, par [a]), the Commissioner specifically found that claimant's obesity, without more, constituted "a *physical or medical impairment* demonstrable by medically accepted clinical diagnostic techniques" (emphasis added). Having made this factual finding of impairment he concluded that the impairment inherent in the condition of obesity, standing alone, met the statutory definition of "disability" (Executive Law, § 292, subd 21). He ordered Xerox to offer McDermott an equivalent position and to pay her back pay and damages for hurt, humiliation and mental anguish.

In reversing the Commissioner's determination, the State Human Rights Appeal Board found on its factual analysis of the record "no evidence that complainant suffered from any physical, mental or medical impairment". Moreover, the Board rejected the Commissioner's legal interpretation of subdivision 21 of section 292 and held, as a matter of law, that irrespective of the impairing characteristics inherent in the condition of obesity, proof of some separate additional impairment outside the condition is required by the terms of the statute to meet the definition of disability; in other words, that the *condition itself* may not constitute the "physical * * * or medical impairment" required by the statutory definition, as the Commissioner had held. As explained in its brief, the Board's position is: "Obesity therefore may or may not constitute a disability, based upon its extent and association with other disabling conditions such as high blood pressure * * * Standing alone, however, obesity *per se* is not a disability. While it may be an abnormal physical *condition,* it is not, without more, an *impairment*".[2]

Before discussing the Board's decision, we observe that in deciding an appeal from a division determination, the Board's scope of review is limited like that of a court reviewing a finding of an administrative agency (see *State*

---

2. The Board's holding is stated in its decision as follows: "From the clear meaning of the statutory language, it does not appear that being overweight without proof of any impairment is a disability covered by the statute."

Xerox posits similar interpretations of subdivision 21 of section 292 in its briefs before the Appeal Board and before our court.

*Off. of Drug Abuse Servs. v State Human Rights Appeal Bd.,* 48 NY2d 276, 283). The established rule set forth in *Drug Abuse Servs.* is: "Under subdivision 7 of section 297-a of the Executive Law, the reviewing function of the appeal board is narrowly channeled to the issue of 'whether the order of the division is * * * supported by substantial evidence on the whole record' (subd d), or 'not arbitrary, capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion' (subd e)" (*State Off. of Drug Abuse Servs. v State Human Rights Appeal Bd., supra,* p 283; see, also, *Matter of GAF Corp. v New York State Human Rights Appeal Bd.,* 83 AD2d 974). In considering a claim that agency action is arbitrary or capricious, the question is "whether there is a rational basis" therefor (*Matter of Pell v Board of Educ.,* 34 NY2d 222, 231).

McDermott's proceeding under section 298 of the Executive Law to review the Board's order, under the *Drug Abuse Servs.* rule, then, presents two questions: (1) whether there is substantial evidence (i.e., "such relevant proof as a reasonable mind may accept as adequate", *300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176, 180) to support the Commissioner's finding that McDermott's obesity, without more, "constituted a physical or a medical impairment", and (2) if so, whether there is a rational basis for his holding that such impairment inherent in the condition of obesity, without proof of some separate additional impairment, satisfies the statutory definition of disability (Executive Law, § 292, subd 21).

We conclude that the record contains substantial evidence that McDermott's gross obesity, in itself, is a physical or medical impairment "which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques" (Executive Law, § 292, subd 21). "Impairment" is defined as "damage, injury, deterioration" and the definition of "impair" is "to make worse, less, weaker * * * to lessen in power" (Webster's New Twentieth Century Dictionary [2d ed], p 910). There can be no question that Dr. Wright recommended against McDermott's employment because her disease of "active gross obesity" placed her in a group

which had statistically higher medical risks with greater resulting costs to the company in absenteeism due to sickness and in increased premiums for disability and life insurance.[3] In short, McDermott was found to have a sufficient health impairment to be a medically unacceptable risk and for this reason she was rejected. We think, without more, that this is a sufficient basis for the Commissioner's finding that "complainant's obesity, clinically observed as an abnormality * * * constituted a * * * medical impairment demonstrable by medically accepted diagnostic techniques." Indeed, we agree with the Commissioner that Xerox' argument — that although McDermott's health impairment was reason enough for her rejection it, nevertheless, was not an impairment under the Human Rights Law — is "mere semantic equivocation."

Furthermore, it is an accepted fact that obesity limits one's physical agility and endurance. A person who, like complainant, carries a burden of 100 pounds of excess weight moves more slowly and tires more quickly than one without that burden. We conclude, then, that gross obesity, in addition to constituting a *medical* impairment as a condition which leads to health disorders, also constitutes a *physical* impairment within the meaning of the statute as a condition "which prevents the exercise of a normal bodily function" (Executive Law, § 292, subd 21).

Turning to the Appeal Board's rejection of the Commissioner's interpretation of the word disability as defined in the statute, we note at the outset that the Commissioner is the head of the agency responsible for the administration of the Human Rights Law (see Executive Law, §§ 293, 295) and that his construction is entitled to great weight unless manifestly wrong (see McKinney's Cons Laws of NY, Book 1, Statutes, § 129; *Matter of John P. v Whalen,* 54 NY2d 89, 95). Our analysis compels the conclusion that the Commissioner's interpretation reflects a commonsense reading of the statute and is consistent with the over-all intent and design of the Human Rights Law.

---

**3.** See, generally, Baker, The Rehabilitation Act of 1973: Protection for Victims of Weight Discrimination?, 29 UCLA L Rev 947, particularly p 950 on the health consequences of obesity where the author states: "Many obese individuals also suffer from complicating medical conditions, either the product of or associated with their obesity. Such conditions include diabetes, gall bladder problems, and cardiovascular disease. Thus, increased mortality rates are associated with serious obesity".

There is nothing in the definition of "disability" in subdivision 21 of section 292 as "a physical, mental or medical impairment resulting from anatomical, physiological or neurological conditions" which suggests that the term was intended, as respondents argue, to include only conditions which have resulted in or are accompanied by other ascertainable impairments outside of the condition itself and that, thus, as argued in the Board's brief, obesity per se, as a matter of law, may not, without more, constitute a "disability".[4] No reason is offered for such construction which would *exclude* someone like McDermott who suffers from those impairments which are inherent in the condition of obesity but has no other demonstrable impairment and which would, at the same time, *include* as protected under the statute a person with the same degree of obesity accompanied by high blood pressure or diabetes. The Board's narrow reading of the statute, in our view, results in an unfair and unreasonable classification, and it must be presumed that the Legislature could not have intended it (see, generally, McKinney's Cons Laws of NY, Book 1, Statutes, §§ 141, 143, 145, 146, 147).

The Commissioner's interpretation finds ample support in the fundamental ethical and moral principles of equality and fairness underlying the enactment of the Human Rights Law and reflected in the stated purpose: "to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life" (Executive Law, § 290, subd 3). Moreover, the Commissioner's construction furthers the aim of the amending legislation in 1974 when the Human Rights Law was expanded to protect disabled persons (L 1974, ch 988), i.e., that of promoting "hiring practices which emphasize the capacity of the individual and his worth as a prospective employee, by abrogating employment practices which blind an employer to the job applicant's individual worth because of a disabil-

4. Respondents urge that it is clear from the statutory language that a condition, standing alone, cannot constitute an impairment (see p 546, n 2, *supra*). We note, however, that in subdivision 21 of section 292 the words "impairment" and "condition" are treated as having the same general meaning as "disability" (e.g., use of "impairment" as meaning "disability" in the following clause: "[t]he term 'disability' means a physical, mental or medical impairment"; and use of "condition" as meaning "disability" in the following clause: "the term [i.e., 'disability'] shall be limited to physical, mental or medical conditions"). Thus, it may be argued that the Legislature intended that a condition, standing alone, could constitute an impairment.

ity" (Governor's Memorandum, NY Legis Ann, 1974, p 415).

Finally, it is a legislative mandate that the Human Rights Law be "construed liberally for the accomplishment of the purposes thereof" (Executive Law, § 300; see *300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176, 183, *supra*). The courts, it has been held, have a duty to see that the law is carried into effect and "that the intent of the Legislature is not thwarted by a combination of strict construction of the statute and a battle with semantics" (*City of Schenectady v State Div. of Human Rights,* 37 NY2d 421, 428).

In sum, we find the Commissioner's determination to be based on substantial evidence and on a construction of the statute which is entirely reasonable.

The petition should, therefore, be granted, the order of the Appeal Board annulled, and the determination of the Commissioner reinstated.

DILLON, P. J., CALLAHAN, DENMAN and MOULE, JJ., concur.

Petition unanimously granted, order of Appeal Board annulled, and determination of State Division of Human Rights reinstated, with costs to petitioner.